Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

TD AUTO FINANCE LLC,

*Plaintiff,*

v.

CINEMA CAR II, INC.,

*Defendant.*

Civil Action No. 13-4230

**OPINION**

**John Michael Vazquez, U.S.D.J.**

**THIS MATTER** comes before the Court by way of the Motion for Partial Summary Judgment filed by Plaintiff TD Auto Finance LLC ("TDAF") and the Cross-Motion for Summary Judgment filed by Defendant Cinema Car II, Incorporated ("Cinema"). D.E. 54, 61. The Court reviewed all submissions made in support and in opposition to the motions,[1] and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Plaintiff's motion is **GRANTED** and Defendant's motion is **DENIED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

---

[1] Cinema's original response to TDAF's statement of material facts and Cinema's statement of material facts in support of its cross motion did not comply with the requirements of L. Civ. R. 56.1(a). D.E. 61-1. The Court provided Cinema with an opportunity to submit appropriate documents, which Cinema filed on September 13, 2016. D.E. 69, 70. The Court also provided TDAF with an opportunity to refile its response to Cinema's revised statement of facts in support of its cross-motion. TDAF filed its revised response ("Response to DSOMF") on September 20, 2016. D.E. 75.

Plaintiff is an automobile finance company "that offers indirect new and used vehicle financing through an extensive network of [d]ealers." Plaintiff's Statement of Undisputed Material Facts ("PSOMF") ¶ 1 [D.E. 55]. Defendant is a New Jersey corporation located in Westwood, New Jersey "that indirectly sells and leases automobiles" and was a dealer in TDAF's network. *Id.* ¶¶ 2-3. From approximately June 4, 2012 to January 2, 2013, Cinema "participated in the TDAF Retail Installment Contract and Lease Program" which was governed by the Retail Installment Contract and Lease Program Agreement (the "Program Agreement"). *Id.* ¶¶ 3-4. As such, Cinema "originate[d] motor vehicle retail installment contracts" ("RICs")[2] through vehicle sales to individual purchasers, and then sold "RICs that complied with the express terms and conditions of the Program Agreement" to TDAF. *Id.* ¶ 5.

Some of the RICs TDAF purchased from Cinema indicated that individual purchasers bought additional insurance coverages, including service contracts and GAP plans, at the time of the vehicle purchase. Declaration of William L. Reid III in Support of Plaintiff [TDAF]'s Motion for Partial Summary Judgment ("Reid Decl.") ¶¶ 19-20 [D.E. 57]. A service contract is an extra insurance or warranty that "covers the costs associated with vehicle repair, including parts, labor, and/or sales tax, for certain repairs or replacements[.]" *Id.* ¶ 17. A GAP plan is another type of insurance that "pay[s]-off any deficiency between amounts paid for collision coverage and owed on financing in the event a vehicle is declared a total loss." *Id.* ¶ 18.

The Program Agreement, which was executed by the parties on June 4, 2012 and governed by New Jersey law, set forth the terms under which TDAF would purchase RICS from Cinema. PSOMF ¶¶ 4-5, 13. Pursuant to the Program Agreement, Cinema agreed to a number of

---

[2] A RIC is a "contract entered into between a consumer and a car dealer, whereby the consumer agrees to purchase a vehicle and pay over time." PSOMF ¶ 5 n.1.

representations and warranties regarding each RIC that was purchased by TDAF. The representations and warranties relevant to this motion include the following:

- [Cinema] has furnished [TDAF] with credit information received by [Cinema] with respect to the Customer and the [RIC], and such information is true, complete and accurate.

- The Customer, the Vehicle and the provisions of the [RIC] correspond in all respects with the Customer, the Vehicle and the provisions of the proposed contract for which approval was granted by [TDAF].

- The Customer has accurately represented his or her identity and all other relevant information on the [RIC], the credit application and all other documents and the Customer has not misappropriated the identity or information of another individual.

- Any extended warranty insurance or service contract that may have been purchased from or through [Cinema], and included in the [RIC], is in full force and effect.

- [Cinema] properly completed the [RIC], and the [RIC] contains all required information, which is correct and accurate in all respects.

- In the event a [RIC] includes a charge for any type of standardized plan or insurance policy for ancillary products, plans or services approved by [TDAF] . . . [Cinema] represents and warrants that Customers charged for Coverage received such Coverage.

PSOMF ¶¶ 6-9. The Purchase Agreement also set forth the remedies available to TDAF if Cinema breached the contract. The parties agreed that in the event of a material breach, Cinema must immediately satisfy its guaranty and indemnity obligation, or alternatively, repurchase each affected RIC. *Id.* ¶¶ 11-12. The Purchase Agreement also establishes that TDAF is entitled to recover reasonable attorneys' fees and costs associated with enforcing the terms of the Program Agreement. *Id.* ¶ 13.

Six months after the parties executed the Program Agreement, "the New York Department of Motor Vehicles notified TDAF that an individual attempted to use fraudulent documents to

3

register and obtain a license plate for a vehicle relating to a RIC that Cinema [] sold to TDAF."[3]
*Id.* ¶ 17.  Because of this incident, "TDAF initiated an audit of the RICs that Cinema [] sold to it
under the Program Agreement."  *Id.* ¶ 18.  This audit revealed a number of issues with the RICs,
and ultimately resulted in this litigation.  The RICs that were identified as problematic through
TDAF's investigation fall into three categories:  Schedule A Contracts, Schedule B Contracts, and
Schedule C Contracts.

 **Schedule A Contracts**: The TDAF investigation revealed that twenty-five RICs "did not
have the necessary [s]ervice [c]ontracts and/or GAP [p]lans in place as required by the Program
Agreement."  *Id.* ¶ 23.  TDAF alleges that each of the RICs at issue represents that a service
contract and/or GAP plan was in place when, in fact, there was no such coverage.  Specifically,
TDAF alleges that fourteen RICS do not have service contracts in place, three are missing GAP
plans, and eight are missing both GAP coverage and a service contract.  Reid Decl. Ex. C.  TDAF
provided documentation to demonstrate that the outstanding amount of financing due and owing
for the Schedule A RICs is $751,629.46.  PSOMF ¶ 54.

 Cinema contends that all of the Schedule A RICs had the required service contracts and
GAP plans in place.  Although Cinema did not provide TDAF with the underlying service contracts
or GAP plan agreements, it did give TDAF "warranty declaration pages" for each of the service
contracts and GAP plans at issue in Schedule A.  Cinema alleges that these declaration pages
demonstrate that the coverages were actually in place.  Statement of Undisputed Facts of [Cinema]

---

[3] The vehicle at issue, a Porsche Panamera, was recovered by law enforcement in Texas and was
taken into possession by Hartford Insurance Company.  Declaration of Guy J. Carnazza ("Carnazza
Decl.") ¶¶ 16, 19-20.  Cinema denies that it was aware of the identify theft when the vehicle
purchase occurred.  Cinema, however, fired the employee who was involved in the sale because it
was concerned that the employee's carelessness "would harm the relationship between TDAF and
Cinema[]."  Carnazza Decl. ¶ 18.

in Support of Cross-Motion for Partial Summary Judgment ("DSOMF") ¶¶ 5, 10 [D.E. 69]. In addition, Cinema alleges that TDAF has not suffered any damages relating to the Schedule A RICs because the vehicles are either paid in full or the purchaser is making timely payments. *Id.* ¶¶ 13-14, 16-17.

**Schedule B Contracts:** TDAF's investigation also revealed that two RICs it purchased from Cinema "did not have the required GAP [p]lans in place and the vehicles in question were totaled leaving a deficiency between the available automobile collision coverage and the amounts due and owing to TDAF under the RICs." PSOMF ¶ 24. The deficiency for the Schedule B RICs is $9,492.24. *Id.* ¶ 55. Cinema also denies that the Schedule B RICs did not have GAP coverage and states that the warranty declaration pages it produced establish that GAP coverage existed. DSOMF ¶ 10. Moreover, Cinema alleges that four vehicles have been paid in full after the insurance company declared the vehicle a total loss and "a GAP coverage claim was pending" as to one of the RICs at issue. *Id.* ¶¶ 11-12.

**Schedule C Contracts:** Through its investigation, TDAF also ascertained that some RICs, two of which are at issue in this litigation, involved incidents of alleged identity fraud or contained misrepresentations from customers. One of the RICs included in Schedule C is associated with the Porsche Panamera referenced in note 3. PSOMF ¶ 52; Reid Decl. Exs. M-N. As for the second RIC, TDAF alleges that, first, different employers and income were listed on the RIC and a related application and, second, that a vehicle trade-in was listed on the RIC but trade-in money was never provided. PSOMF ¶ 53; Reid Decl. Ex. N. In total, TDAF alleges that it lost $154,093.81 from the Schedule C RICs. PSOMF ¶ 56. Cinema acknowledges that the Panamera was purchased through identify theft (DSOMF ¶ 15), but otherwise denies that it "facilitated the financing of any

motor vehicle knowing that the information . . . provide[d] by the customer was not truthful, accurate, and complete." Def's Br. at 4-5 [D.E. 62].

TDAF and Cinema had multiple meetings to discuss the audit findings. On March 27, 2013, TDAF requested that Cinema provide evidence of the service contract and GAP coverage at issue "in a form satisfactory to [TDAF] in [TDAF's] sole discretion," or repurchase all the RICs at issue. PSOMF ¶¶ 29-30, 32, 35. Cinema did not repurchase any of the RICs and failed to provide evidence that was satisfactory to TDAF. *Id.* ¶¶ 36-41.

TDAF subsequently filed this lawsuit on July 10, 2013. TDAF's complaint asserts two breach of contract claims for the Schedule A and B RICs, due to Cinema's failure to obtain the service contract and GAP plan coverage as represented in the RICs, as well as a third breach of contract claim for the Schedule C RICs due to the false or misleading information contained in the RICs. TDAF also asserted claims for promissory estoppel and unjust enrichment. *See* Complaint [D.E. 1]. During discovery, Cinema failed to produce any underlying contracts for the allegedly missing coverages. Cinema did, however, produce service contract and GAP plan "declaration pages." DSOMF ¶¶ 5-6, 10. Cinema contends that these declaration pages establish that the additional coverages existed for the Schedule A and B RICs. *Id.* Cinema also contends that it "self-insured" the service contracts and a company called After Market Sales Are Profitable ("After Market") was the warranty administrator. DSOMF ¶¶ 6-7; Declaration of Joe F. Irizarry ("Irizarry Decl.") ¶ 15 [D.E. 61-4]. Cinema insists that GAP coverage was provided by one of four unnamed coverage providers. Irizarry Decl. ¶ 19.

Cinema's current representation that it self-insured the service contracts and used four unnamed companies to provide the GAP plans, however, is not the first or even second explanation as to how it provided the coverage. On April 12, 2013, Cinema represented that the required

6

service contracts were provided by Auto Source of Toms River and that the GAP plans were provided by GMACI Advantage Programs. PSOMF ¶ 36. Instead of providing TDAF with documentation to confirm this statement, Cinema "suggest[ed] that a representative of [TDAF] contact the representative . . . for each of the entities" to confirm that the required coverages exist. Reid Decl. Ex. J. When TDAF contacted the two entities, it was unable to ascertain whether the coverage was in place. PSOMF ¶ 39.

Cinema continued to provide inconsistent information and limited documentary support during discovery. In response to TDAF's first set of interrogatories, Cinema stated that coverage was provided by entirely different entities than it had first represented: the service contracts were provided by After Market and Auto Source of America, while the GAP policies were purchased through Gap Care Advantage and American Heritage Insurance Services. *Id.* ¶ 45.

During his deposition, Guy J. Carnazza, the president of Cinema, testified that Cinema provides and self-insures the service contracts – which is Cinema's current position. Carnazza further testified that despite self-insuring the service contracts, Cinema does not keep reserves for service contract costs. Carnazza testified that instead Cinema draws from its operating budget for service contract costs. Carnazza Dep. 80:1-15 [D.E. 66]. But again, Cinema failed to provide any evidence to substantiate its claim of self-insurance or, for that matter, to explain why it had made two different representations in the past. As for the GAP plans, Cinema's current position is that "coverage was placed through one of four coverage providers that [Cinema] used at the time." Irizarry Decl. ¶ 19.

TDAF now seeks summary judgment pursuant to Federal Rule of Civil Procedure 56 for its three breach of contract claims. D.E. 54. In terms of relief, TDAF wants Cinema to repurchase the Schedule A RICs for the outstanding amount due as well as pay monetary damages regarding

7

the Schedule B and C RICs.  *See* Plf's Br at 21-22 [D.E. 56].  TDAF also seeks attorneys' fees and costs pursuant to the Purchase Agreement.  *Id.* at 34-35.  Cinema filed a brief opposing TDAF's motion and also filed a cross-motion for summary judgment.  Cinema, however, does not seek summary judgment as to any of TDAF's counts.  Instead, Cinema requests summary judgement as to vehicles relevant to TDAF's claims.  [D.E. 61-62].  Through its cross-motion, Cinema "seeks an Order dismissing the vehicles which have been paid in full and an Order dismiss[ing] the vehicles which are . . . in a current [payment] status."  Def's Br. at 6.  Cinema also seeks an order dismissing the vehicles that TDAF alleges are missing service contracts or GAP coverage because it provided evidence of the applicable coverage.  *Id.* at 5-6.

## II.    SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment.  *Id.*  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)).  A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

### III.   ANALYSIS

The parties agree that the Program Agreement is governed by New Jersey law. *See* PSOMF ¶ 13. To establish a breach of contract under New Jersey law, "a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007). There is no dispute that the parties entered into the Program

Agreement, a valid and unambiguous contract.[4]   PSOMF ¶ 4.   The dispute is whether Cinema properly performed its contractual duties and if TDAF incurred damages.

### 1.  Breach of Contract for Counts I and II (Schedule A and B RICs)

#### a.  Breach of the Program Agreement

TDAF argues that through the Program Agreement, Cinema "represented and warranted that customers charged for coverages . . . under the RICs being sold, actually received the coverages." Plf's Br. at 24-25.   TDAF asserts that Cinema breached the Program Agreement because it sold RICs that indicated that a service contract and/or GAP plan was in place when, in fact, there was no such coverage. Plf's Br. at 24-25, 31. Cinema counters that TDAF's allegation "is contrary to the evidence contained in the record." Def's Br. at 9.  Specifically, Cinema argues that "the warranty declaration pages . . . , the declaration of Joe F. Irizarry, and the testimony of Robert Marchionni . . . establish that the service warranties were in place," and GAP coverage existed. *Id.* at 10.  This evidence, however, fails to establish or create a genuine issue of material fact that Cinema provided the service contracts or GAP coverage as represented.

Irizarry, the Business Manager at Cinema, first states that the service warranties were provided by After Market.  Irizarry Decl. ¶¶ 4, 14.  Marchionni, the owner of After Market, however, testified that After Market does not provide service contracts for vehicles purchased through Cinema.  Marchionni testified that After Market is only involved after a claim for service is made and that its sole role is to adjudicate claims.  DSOMF ¶ 7; *see also* Irizarry Decl. ¶ 16 ("In the event of a mechanical problem with a covered vehicle, Mr. Marchionni as the warranty administrator makes the determination if the repair is a covered item.  If the determination is made

---

[4] Cinema makes no challenge as to the meaning or import of the pertinent language found in the Program Agreement.

that the repair is covered, [Cinema] is then obligated to have the repair made at its own cost."). Irizarry claims that Cinema is self-insured and After Market is the warranty administrator. Irizarry Decl. ¶ 15; *see also* Carnazza Dep. 80:1-15 (stating that Cinema self-insures the service contracts). Yet, this statement is internally inconsistent with the prior paragraph in Irizarry's declaration, and Cinema fails to produce any evidence to substantiate its assertion that it self-insures the service contracts. As for the alleged lapse in GAP coverage, Irizarry states that "GAP coverage was placed through one of four coverage providers that [Cinema] used at the time." Irizarry Decl. ¶ 19. Neither Irizarry nor Cinema, however, provide any other information, such as the names of the four coverage providers, much less documents reflecting the coverage.

Irizarry also states that the warranty declaration pages correspond with each of the vehicles at issue in Schedule A, B, and C. *Id.* ¶¶ 14, 18. As discussed, Cinema contends that these declaration pages establish that the coverages existed. DSOMF ¶¶ 5, 10. The warranty declaration pages, however, fail to substantiate Cinema's assertion that it actually provided service contracts and GAP coverage.[5] First, the vehicles listed in the declaration pages do not correspond with the Schedules A and B RICs. TDAF alleges that twenty-three RICs in Schedule A and B are missing service contracts. Reid Decl. Exs. C, D (listing missing coverages in Schedule A and B). Cinema, however, provided service contract warranty declaration pages for twenty-seven vehicles. Irizarry

---

[5] TDAF also argues that Cinema cannot rely on the declaration pages to prove the existence of the service contracts and GAP plans because doing so violates Federal Rules of Evidence 1001-1002, or the "best evidence rule." Plf's Reply at 9-10 [D.E. 66]. TDAF asserts that the best evidence rule requires a party to produce the original, underlying document to prove its contents, and that the failure to produce the underlying document results in inadmissibility. *Id.* But Cinema apparently does not attempt to use the declaration pages to demonstrate the contents of the underlying service contracts or GAP plans. Instead, Cinema states that the declaration pages themselves establish that the coverage existed. Def's Br. at 10. Consequently, TDAF's argument is inapplicable in light of Cinema's claim.

Decl. Exs. A-B.  In addition, TDAF alleges that nine RICs in Schedule A and B are missing both a service contract and GAP coverage.  Reid Decl. Ex. C, D.  But, of the information produced by Cinema, only five service contract warranty declaration pages and GAP coverage warranty declaration pages have matching VIN numbers. Irizarry Decl. Exs. A-B.  Consequently, the Court is unable to determine whether and how the warranty declaration pages correspond with the vehicles listed in Schedule A and B.

Moreover, the warranty declaration pages do not establish that Cinema self-insured the service contracts or that GAP coverage was provided by four (unidentified) providers.  First, one of the warranty declaration pages is titled "Contract Application" and is from GWC Warranty, a company that Cinema has never mentioned before.  *See* Irizarry Decl. at 15.  Cinema fails to provide any additional evidence to establish whether the application was approved or even submitted.  In addition, three of the warranty declaration pages that allegedly demonstrate that GAP coverage existed discuss an extended service plan and do not mention GAP coverage.  *Id.* at 54-57.  Moreover, these three declaration pages are from Autosource, a company that Cinema previously told TDAF it used for service contracts before Cinema took its current position, *i.e.* that it self-insures.  PSOMF ¶ 36.  Cinema also provided two Autosource declaration pages and one from AUL Administrators[6] to demonstrate that service contracts existed, despite its most recent contention that it actually self-insures the service contracts.  Irizarry Decl. at 14, 26, 31.  Finally, the majority of the declaration pages that allegedly establish that service contracts existed appear to be contracts between After Market and the vehicle purchaser.  These declaration pages provide that "the dealer is entitled to receive compensation from [After Market] for services rendered in

---

[6] The declaration page from AUL is entirely blank except for the vehicle purchaser's signature block.  Irizarry Decl. at 14.

the sale of this [contract]," and "[After Market's] performance under this [contract] is insured separately . . . ." *See, e.g., id.* at 9. This language apparently indicates that After Market had some contractual relationship with the vehicle purchasers. Cinema, however, appears to contend that After Market is merely a claims administrator. Irizarry Decl. ¶ 19; Reply Br. Ex. B, Carnazza Dep. 80:1-15.

Consequently, the Court concludes that Cinema fails to present a genuine issue of material fact contradicting TDAF's proof that Cinema failed to provide the service contracts and GAP coverage as was represented in the RICs. Because Cinema represented in the Program Agreement that it would provide such coverage (PSOMF ¶¶ 6, 9), this failure constitutes a breach of the Program Agreement and no genuine issue of material facts exists to the contrary. Thus, as to Counts I and II, TDAF is entitled to summary judgment regarding liability.

### b.  TDAF's Damages as a Result of the Breach

TDAF argues that it "bargained to receive RICs that were complete, accurate and not misleading." Plf's Br. at 25. When TDAF purchased RICs that did not actually have the service contracts and/or GAP plans as indicated, TDAF did not receive the benefit of its bargain. *Id.* As a result, TDAF argues that pursuant to the plain terms of the Purchase Agreement, Cinema must repurchase the Schedule A RICs and indemnify it for losses related to the Schedule B RICs. *Id.* at 26, 31.

### i.  Count I Damages (Schedule A RICs)

Cinema argues that TDAF did not incur any damages because fifteen vehicles are fully paid off and twelve vehicles are in current payment status. Def's Br. at 6. At the outset, TDAF is not seeking to recover damages for vehicles that have been paid in full and did not include any such vehicles in Schedule A. Response to DSOMF ¶ 11; *compare* Lodato Decl. Ex. A-V

13

(deposition excerpts addressing accounts that are paid in full), *with* Reid Decl. Exs. C (providing list of Schedule A account numbers). In addition, whether vehicle purchasers are in current payment status does not impact TDAF's claim for relief. Service contracts and GAP plans affect the overall purchase price of a RIC and increase the amount of financing that TDAF indirectly provided. Plf's Br. at 25. In other words, TDAF paid more to purchase RICs that included a service contract and/or GAP coverage. Consequently, "TDAF suffered damages as a result of Cinema['s] [] breach of the Program Agreement because it was providing financing for [s]ervice [c]ontracts and GAP [p]lans that did not exist." Response to DSOMF ¶ 17. Cinema fails to provide any evidence that genuinely and materially counters TDAF's argument that it was damaged when it paid a premium for the RICs that supposedly contained the additional coverage.

TDAF seeks specific performance requiring that Cinema repurchase the Schedule A RICs because the parties expressly agreed to the right of repurchase if a material breach occurred. As a result, TDAF argues that Cinema should be ordered to repurchase the RICs for $751,629.46, which is the outstanding amount due and owing to TDAF. Plf's Br. at 26-30. Cinema argues that specific performance is not appropriate and compelling it to repurchase the RICs at issue "would result in extreme prejudice." Def's Br. at 12.

Under New Jersey law, "[s]pecific performance is not an automatic remedy for a breach of contract, but rather a matter within the trial court's discretion which must be exercised on the basis of equitable considerations." *Ballantyne House Assocs. v. City of Newark*, 269 N.J. Super. 322, 334 (App. Div. 1993) (citing *Barry M. Dechtman, Inc. v. Sidpaul Corp.*, 89 N.J. 547, 551-52 (1963)). A party seeking specific performance must establish the legal right to such relief by showing that: (1) the contract at issue is valid and enforceable; (2) the terms of the contract are clear, such that the court can determine with reasonable certainty, "the duties of each party and the

conditions under which performance is due;" and (3) an order compelling performance would not be "harsh or oppressive." *Marioni v. 94 Broadway, Inc.*, 374 N.J. Super. 588, 598-99 (App. Div. 2005) (internal citations omitted).

A court should not award specific performance based on the mere showing of the right to such relief. Instead, it must "examine the facts, circumstances, and incidents underlying the parties' dispute to determine whether and how to fashion relief that serves the equities." *Textron Fin.-N.J. Inc. v. Herring Land Grp., LLC*, No. 06-2585, 2012 WL 1079613, at *19 (D.N.J. Mar. 30, 2012). This consideration "may modify the relief sought or, perhaps, entirely prevent its exercise." *Id.* (quoting *Marioni*, 374 N.J. Super. at 599). Consequently, when considering these equitable factors, the court must also (1) "appraise the respective conduct and situation of the parties;" (2) consider the clarity of the agreement; and (3) determine "the impact of an order compelling performance, that is, whether such an order is harsh or oppressive to the defendant or whether a denial of specific performance leaves plaintiff with an adequate remedy." *Marioni*, 374 N.J. Super. at 600 (internal citations omitted). In short, there must be "a conscious attempt on the part of the court of equity to render complete justice to both parties." *Id.* Further, a court "will often direct performance of such a contract because, when there is no excuse for the failure to perform, equity regards and treats as done what, in good conscience, ought to be done." *Id.* at 600-01.

The Program Agreement provides that "should any representation or warranty made hereunder . . . prove to be false or incorrect in any material respect, [TDAF] shall have the right to insist that [Cinema] immediately pay and satisfy [TDAF's] guaranty and indemnity obligations under this Agreement, or alternatively to repurchase each affected [RIC]." PSOMF ¶ 11. In addition, "[Cinema] agrees to guarantee payment in full of, or alternatively to repurchase, each

15

[RIC] that is affected or may be affected by [TDAF'S] failure to perform its obligations under this Agreement, or by a material breach of any of [TDAF'S] representations or warranties as provided herein." Reid Decl. Ex. A at 6. As discussed, there is no dispute that the Program Agreement is valid, enforceable and clear. In addition, the Program Agreement provides TDAF with alternatives as to the form of relief available to it upon a breach. "Alternative" is defined as "offering or expressing a choice." Mirriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/alternative (last visited December 13, 2016). Thus, TDAF has the clear right to choose between enforcing Cinema's indemnity obligations and the repurchase option. Consequently, TDAF's request that Cinema should be ordered to repurchase the Schedule A RICs is consistent with its rights under the Program Agreement.

Cinema argues that repurchase is not an appropriate remedy because the additional coverages it failed to provide "are not essential to the contract."[7] Def's Br. at 11-12. Cinema further contends that *The Bluffs at Ballyowen, LLC v. Toll Brothers, Incorporated*, a case that allegedly supports TDAF's position, is distinguishable. *See* No. A-3285-09T3, 2010 WL 4823819 (N.J. App. Div. Nov. 30, 2010). The Court disagrees. In *Toll Brothers* the court determined that the contract at issue "carefully crafted what would happen if Toll defaulted" and provided plaintiff with an "unambiguous choice of a single equitable remedy" of specific performance. *Id.* at *9. Consequently, the Appellate Division concluded that the trial court erred when it created a new remedy by providing monetary damages to plaintiff. The court stated that because the contract explicitly defined the sole available remedy, plaintiff "was contractually bound . . . to specific

---

[7] This argument essentially addresses liability, rather than remedy, because it concerns the materiality of contract terms. Other than its bare assertion, Cinema provides no authority or analysis supporting its position that the additional coverage was not material to the Program Agreement.

performance in the first instance." *Id.* at *10. Here, the Program Agreement "carefully crafted" TDAF's remedies if Cinema breached any of the representations or warranties. PSOMF ¶¶ 11-12.

Cinema also appears to argue that specific performance is unequitable under the facts at hand. Def's Br. at 12. Cinema alleges that specific performance would be oppressive because TDAF failed to commence actions against defaulting customers to collect any deficiencies. Def's Br. at 12. This approach however, does not take into account the premiums paid by TDAF when purchasing RICs that it believed had the necessary coverage for the additional insurance. Moreover, there is nothing in the Purchase Agreement indicating that TDAF should or must seek relief from the customers. To the contrary, the Purchase Agreement makes clear that TDAF's remedy lies with Cinema. Finally, the suggested approach fails to account for the additional costs TDAF would have to incur, including potential litigation, if TDAF chose to seek relief from the customers. In fact, the customers may have a valid defense to any such action if he/she could show that they never sought or purchased the additional coverage or if they paid for an additional coverage that was never actually provided.

Further, it is unlikely that Cinema will suffer any material damage or harm in repurchasing the Schedule A RICs. Cinema can continue to collect payments from vehicle purchasers; Cinema itself even admits that twelve vehicles at issue are in current payment status. DSOMF ¶ 14. If these purchasers continue to make timely payments, the only risk Cinema faces is if a situation arises in which service and/or GAP coverage is needed. This risk, however, is entirely of Cinema's own doing because it falsely represented that such coverage existed so it should be forced to bear the risk itself. In addition, as it alleges TDAF should have done, Cinema can commence actions against defaulting customers if it so chooses. Consequently, the Court concludes that requiring Cinema to repurchase the Schedule A RICs is not harsh or oppressive.

As a result, the Court will order Cinema to repurchase the Schedule A RICs at their current value, *i.e.* the value in light of the payments TDAF has received to date.

### ii.    Count II Damages (Schedule B RICs)

Schedule B includes two RICS that did not have the represented GAP coverage. After the vehicles were declared totaled, the insurance payments were insufficient to cover the amount still owed to TDAF. PSOMF ¶ 24. "As a result, and in absence of the valid GAP [p]lans that were represented to be in place, TDAF was unable to collect the balance due on its financing after insurance covered the losses." Plf's Br. at 31. TDAF claims that the Program Agreement requires Cinema to indemnify TDAF for its losses, that is, $9,434.52.

Although Cinema denies that TDAF suffered damages as a result of the missing GAP coverage, it does not provide any genuine and material evidence contradicting TDAF's statement that there are outstanding balances for the Schedule B RICs. Cinema alleges that TDAF representative William Butterfield testified that a GAP coverage payment was pending for one vehicle.[8] DSOMF ¶ 12. But Butterfield did not actually state that a GAP payment was pending. Rather, he testified that primary insurance was paid on the account but that "we're waiting on confirmation of GAP." Lodato Decl. Ex. O., Butterfield Dep. 41:10-24. Cinema does not provide any additional evidence to demonstrate that GAP coverage was confirmed or that a payment was

---

[8] Cinema also argues that Butterfield testified that four vehicles were paid off by insurance proceeds, which demonstrates that GAP coverage existed. Def's Br. at 10. This argument is misplaced because the vehicles Butterfield was discussing are not included in Schedule B. *Compare* Reid Decl. Ex. D (listing the account number contained in Schedule B), *with* Lodato Decl. Exs. F, I, K, L, M (Butterfield's testimony as to the account numbers that are paid off). Further, information that may establish whether GAP coverage existed for other RICs does not demonstrate that the coverage was in effect for the Schedule B RICs. Indeed, if GAP coverage had actually been in place, as Cinema argues, then TDAF would not have suffered the losses it seeks to recoup here.

received. TDAF avers that there was no GAP coverage. Because TDAF has not received payment

for this RIC, it is entitled to summary judgement. In addition, Cinema does not address the second

Schedule B RIC. Consequently, Cinema fails to provide sufficient evidence to create a genuine

issue of material fact as to whether TDAF suffered damages due to Cinema's failure to provide

GAP coverage for both Schedule B RICs.

As discussed, the Program Agreement requires Cinema to indemnify TDAF for losses that

result from a breach of the Agreement.[9]   Therefore, the Court will enter summary judgment in

favor of Plaintiff for Count II of the complaint and judgment will be entered for the amount of

$9,492.24.[10]

### 2.  Breach of Contract for Count III (Schedule C RICs)

TDAF also seeks summary judgment as to Count III, which alleges that Cinema sold two

RICs that contained information that was "untrue, incomplete and inaccurate." Plf's Br. at 32.

TDAF alleges that in one RIC "the credit application furnished to TDAF was not true, complete

and correct." PSOMF ¶ 53. Specifically, TDAF alleges that the RIC and the related credit

application listed different employers and income, and that the vehicle trade listed in the RIC never

occurred. *Id.* The second RIC in Schedule C relates to the Porsche Panamera discussed in note 3.

TDAF states that Cinema acknowledged the "[identity] theft deal and accepts responsibility." *Id.*

TDAF argues that by selling these RICs, Cinema breached multiple representations in the Program

Agreement. Plf's Br. at 32. Cinema acknowledges the one instance of identity fraud as to the

---

[9] The guaranty and indemnity obligations require Cinema to indemnify TDAF and hold it harmless from "any and all claims, suits, obligations, damages, losses, costs, [and] expenses . . . of every nature and kind, that may be asserted against or incurred by such Indemnified Persons arising out of or in any way occasioned by this Agreement." Reid Decl. Ex. A at 5-6.

[10] Cinema does not dispute the amount that it would owe for the Schedule B RICs if a breach occurred.

Porsche Panamera but otherwise denies that it breached the Program Agreement as to the Schedule C RICs. Def's Br. at 4-5. Cinema denies having any knowledge of fraudulent conduct or that it "facilitated the financing of any motor vehicle knowing that the information being provided by the customer was not truthful, accurate and complete." *Id.*

Again, there is no dispute that the parties entered into a valid, unambiguous contract through which Cinema represented that each vehicle purchaser "is a bona fide individual," and that "the Customer has accurately represented his or her identity and all other relevant information on the Contract, the credit application and all other documents and the Customer has not misappropriated the identity or information of another individual." PSOMF ¶ 6.

Cinema argues that it did not breach the Program Agreement because the ultimate decision of whether to grant or deny credit information was made by TDAF. Def's Br. at 5. Even if this is true, it in no way affects Cinema's obligation pursuant to the Program Agreement. Cinema also appears to argue that it did not breach the Program Agreement for the RIC associated with the Porsche Panamera because it terminated the sales representative who was involved with the transaction. *Id.* at 4. Cinema further states that after the vehicle was recovered by law enforcement, Hartford Insurance Company took possession of the car. *Id.* The Court is at a loss as to how these facts are relevant or negate Cinema's obligations under the Program Agreement. Cinema represented that each vehicle purchaser was a bona fide individual and that the customer information in each RIC was truthful and accurate. PSOMF ¶ 6. Cinema fails to provide any evidence by which a reasonable jury could conclude that this did not occur with the Schedule C RICs. Therefore, Cinema breached the Program Agreement.

TDAF also established that it was damaged by this breach because there are outstanding balances for both Schedule C RICs. PSOMF ¶ 56. As discussed, the Program Agreement requires

Cinema to indemnify TDAF for losses that result from a breach of the Agreement. Again, Cinema presented no evidence creating a genuine issue of material fact as to the damages TDAF suffered. Consequently, the Court will grant summary judgment for Count III of the complaint and will enter judgment in the amount of $154,093.81.[11]

### 3. Cinema's Cross-Motion for Summary Judgment

Cinema filed a cross-motion for summary judgment requesting that the Court dismiss multiple RICs, not counts, from this matter. Cinema argues that the Schedule A RICs that were allegedly missing service contracts be dismissed because the warranty declaration pages establish that the coverage existed and "there has been no damage as to TDAF." Def's Br. at 6. Cinema also argues that it provided evidence that GAP coverage existed, so seeks an order dismissing the RICS that were allegedly missing this coverage "as there has been no damage to TDAF." *Id.* Last, Cinema seeks for the Court to dismiss the RICs in which the vehicles have been paid in full and those in which payments are current "as TDAF has sustained no damages for any of those vehicles." *Id.*

Cinema's arguments are addressed above in connection with TDAF's motion. In sum, Cinema fails to establish, or create a genuine issue of material fact, that the service contracts and GAP coverage existed, or that TDAF did not suffer damages as a result of Cinema's breach of the Program Agreement. In addition, the vehicles that are paid in full are not part of this litigation and whether vehicle purchasers make timely car payments is irrelevant. Consequently, Defendant's cross-motion for summary judgment is denied.

### 4. Attorneys' Fees

---

[11] Cinema does not contest the amount it would owe for the Schedule C RICs if a breach occurred.

TDAF also argues that it is entitled to reasonable attorneys' fees and costs pursuant to the express terms of the Program Agreement. Plf's Br. at 34-35. Although New Jersey law generally disfavors fee-shifting, "a prevailing party can recover [attorneys'] fees if they are expressly provided for by statute, court rule, or contract." *Packard-Bamberger & Co., Inc. v. Collier*, 167 N.J. 427, 440 (2001). When a contract provides for fee shifting, the applicable contractual provision "should be strictly construed in light of our general policy disfavoring the award of attorneys' fees." *Litton Indus., Inc. v. IMO Indus., Inc.*, 200 N.J. 372, 385 (2009). Here, the Program Agreement expressly states that if TDAF is required to retain an attorney to protect its rights under the contract, it would be entitled to recover reasonable attorneys' fees and costs associated with enforcing the terms of the Agreement. PSOMF ¶ 13. Cinema offers no facts, law, or argument to counter TDAF's position. TDAF is the prevailing party and is protecting its rights pursuant to the Program Agreement. Consequently, TDAF is entitled to an award of reasonable attorneys' fee and costs incurred in connection with this action. The Court will grant summary judgment and enter judgment in favor of Plaintiff for an award of reasonable attorneys' fees and costs.

## IV.    CONCLUSION

For the foregoing reasons and for good cause shown Plaintiff's Motion for Partial Summary Judgment (D.E. 54) is **GRANTED** and Defendant's Cross-Motion for Summary Judgment (D.E. 62) is **DENIED**. An appropriate form of order accompanies this opinion.

Dated: December 14, 2016

John Michael Vazquez, U.S.D.J.

22